IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KIMBERLY GADSON, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-1128-M (BH) |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment and Brief in Support* ("Pl. Br."), filed September 21, 2009, and *Defendant's Motion for Summary Judgment and Brief in Support* ("Def. Br."), filed October 20, 2009. Based on the relevant filings, evidence, and applicable law, *Plaintiff's Motion for Summary Judgment* should be **GRANTED,** *Defendant's Motion for Summary Judgment* should be **DENIED**, and the case should be remanded to the Commissioner for further proceedings.

**I. BACKGROUND**[1]

**A.      Procedural History**

Kimberly D. Gadson ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

Title II and Title XVI of the Social Security Act. On July 31, 2006, Plaintiff filed applications for disability insurance benefits ("DIB") and supplementary security income ("SSI"). (Tr. at 13, 56-58, 278-84). She claimed she had been disabled since April 2, 2006, due to bipolar disorder with psychotic features and Grave's disease. (Tr. at 62). Her application was denied initially and upon reconsideration. (Tr. at 39, 272). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 36). She personally appeared and testified at a hearing held on September 22, 2008. (Tr. at 285, 292). On March 26, 2009, the ALJ issued his decision finding Plaintiff not disabled. (Tr. at 10-22). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in her request for review did not provide a basis for changing the ALJ's decision. (Tr. at 5-7). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 5). On June 15, 2009, Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.**     **Factual History**

       **1.**     **Age, Education, and Work Experience**

Plaintiff was born on January 14, 1965 and was 43 years old at the time of the hearing before the ALJ. (Tr. at 56, 288). She has an 11th grade education and a nurse's aide certification. (Tr. at 288). Her past relevant work includes work as a certified nurse aide, (Tr. at 327), and she last worked in 2007, (Tr. at 292).

       **2.**     **Medical Evidence**

              ***a.  University of Kansas Medical Center***

Plaintiff's relevant medical evidence began on July 3, 2006, when she visited the emergency room ("ER") at the University of Kansas Medical Center ("KUMC") complaining of a possible

anxiety attack. (Tr. at 107). She reported chest pain, shortness of breath, constant fatigue, depression, social withdrawal, loss of appetite, and decreased energy. *Id.* She seemed very angry during the visit and burst out in tears. *Id.* Medical notes from her visit reveal that her EKG was normal but her blood pressure was high. *Id.*

Two weeks later, Plaintiff visited KUMC again and reported continued depression, worsening joint pain in her hips and knees, and trouble standing for long periods of time. (Tr. at 103). She complained of loss of appetite, fatigue, shortness of breath, chest pain, muscle aches, and headaches. (Tr. at 104). A physical examination revealed that her joints were not enlarged or tender and had normal strength, and that her lower extremities had a mildly-restricted range of motion due to her joint pain. (Tr. at 105).

In March of 2007, Plaintiff visited KUMC again, and reported fatigue, worsening depression, joint pain and muscle aches. (Tr. at 231-34, 240-43). Her physical examination showed that she was not in acute distress, that she had a normal range of motion in her lower extremities, and that her joints were not enlarged or tender. (Tr. at 232, 242).

In June of 2007, Plaintiff visited Dr. Aref Zaman, M.D., at KUMC for a PAP. (Tr. at 217). Plaintiff mentioned that she suffered from chest wall pain and generalized pain, and that she was recently prescribed Tramadol during a visit to the ER for these problems. *Id.* She complained of shortness of breath, exertion, fatigue, joint pain, muscle pain, and depression. (Tr. at 218-19). Dr Zaman noted that her chest pain remained unchanged but her depression had improved. (Tr. at 219).

In September of 2007, Plaintiff made another visit to the ER at KUMC and reported two episodes of sudden left-sided chest pain which radiated to her left shoulder and arm. (Tr. at 198). Cardiac markers and an EKG performed turned out to be normal, and Plaintiff was sent home with pain medications. *Id.* The same month, Plaintiff returned to Dr. Zaman for a follow up regarding

- 3 -

her chest pain episode.  *Id.*  He diagnosed her with hypothyroidism, hypertension, chest pain, gastro-esophageal reflux disease ("GERD"), and internal hemorrhoids.  (Tr. at 200).

In January of 2008, Plaintiff paid another visit to Dr. Zaman with complaints of fatigue and throbbing headaches that were aggravated by light, lasted for a whole day at times, and were sometimes nine on a ten-point pain scale.  (Tr. at 192).  Dr. Zaman noted that her hypothyroidism had deteriorated, her hypertension had remained unchanged, and that she suffered from headaches. (Tr. at 193).  He instructed her to limit her sodium intake and to keep her blood pressure down.  *Id.*

In July of 2008, Plaintiff visited the ER again with complaints of chest pain.  (Tr. at 146). An EKG, cardiac markers, and chest x-rays performed on her all turned out to be normal, and she was discharged with a diagnosis of anxiety.  *Id.*  Plaintiff saw Dr. Zaman for a follow-up, and he added anxiety to his previous diagnosis.  (Tr. at 147).

On October 6, 2008, Plaintiff returned to Dr. Zaman for lab work for a possible urinary tract infection.  (Tr. at 268).  Plaintiff reported that a psychiatrist, Dr. Malanie Maine, had diagnosed her with type 2 bipolar disorder and manic depression and had started her on medication.  *Id.*

On October 23, 2008, Dr. Zaman completed a physical and mental Residual Functional Capacity questionnaire on Plaintiff's physical and mental limitations.  (Tr. at 254-57).  Regarding her functional limitations, Dr. Zaman opined that Plaintiff had marked restrictions in activities of daily living; moderate limitations in maintaining social functioning; marked deficiencies of concentration, persistence and pace, resulting in failure to timely complete tasks; and repeated episodes of deterioration or decompensation in work-like settings.  (Tr. at 254).  Dr. Zaman noted that Plaintiff did not have the ability to complete a normal work day without interruptions from psychologically based symptoms or to perform at a consistent pace without unreasonable rest periods. *Id.* Concerning her physical limitations, he opined that Plaintiff would be able to sit, stand,

or walk for less than two hours in an eight-hour work day and would require six to seven unscheduled 25- minute breaks during an eight-hour work day.  (Tr. at 255-56).

That same day, Dr. Zaman completed a loan discharge application for Plaintiff in which he certified that she was totally and permanently disabled and that she was suffering from hypothyroidism, hypertension, anemia, hemorrhoids, and vitamin B12 deficiency.  (Tr. at 258).

### b. Consultative Examinations

On July 27, 2006, Dr. Helen Weiser, Ed. S., evaluated Plaintiff at the request of Social Services.  (Tr. at 125-29).  Following the evaluation, Dr. Weiser concluded that Plaintiff presented the profile of a woman with a family history of substance abuse, sexual abuse, and mental health disorders.  (Tr. at 128).  She diagnosed Plaintiff with bipolar disorder with psychotic features and post traumatic stress disorder ("PTSD"), and assigned her a GAF score of 50.  *Id.*  She also noted that Plaintiff was considered a moderate risk for suicide.  *Id.*

As part of the evaluation, Dr. Weiser performed four tests on Plaintiff.  The Shipley Hartford Institute of Living Scale test indicated that Plaintiff's overall intellectual functioning capacity was in the low average range.  (Tr. at 126).  The Minnesota Multiphasic Personality Inventory test revealed that Plaintiff had an overall state of affective and cognitive distress, poor ego strength, virtually no positive coping skills, a disconnect from reality, severe depression and anxiety, lack of trust of others, and lack of assertiveness.  *Id.*  The test also showed that Plaintiff was pessimistic, socially isolated, introverted, and more likely to experience victimization rather than defend herself. *Id.*  The Rotter Incomplete Sentence Test was consistent with the impressions from her other tests and indicated a critical need for intervention services.  *Id.*  The Adult Adolescent Parenting Inventory test indicated a need for parent training, particularly in the areas of emotional empathy and support for her children's power and independence, as well as anger towards her children for

- 5 -

not living up to her expectations.  (Tr. at 128).

On November 4, 2008, Dr. Alan Israel, Ph.D., conducted a psychiatric assessment of Plaintiff, including a Wechsler Adult Intelligence Scale III test and a Wechsler Memory Scale III. (Tr. at 244-51, 246).  The first test revealed a full scale IQ score of 69, a verbal score of 73, and a performance score of 74.  (Tr. at 246).  Dr. Israel noted that Plaintiff's full scale score fell within the area of mild mental retardation and that her verbal and performance score fell within the borderline range.  (Tr. at 247).  Dr. Israel diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood, and borderline intellectual functioning.  *Id.*  He opined, however, that her symptoms were more consistent with depression and anxiety without mood changes.  *Id.* Plaintiff could understand and remember instructions, persist and concentrate on tasks, and adapt to a work-related environment.  (Tr. at 248).  Noting that Plaintiff was driven, had been an assistant manager of a store, and was responsible for raising her children, Dr. Israel concluded that Plaintiff fell more within the border line range than in the area of mild retardation indicated by her full scale IQ test scores.  *Id.*

### 3.    Hearing Testimony

The ALJ held a hearing on September 22, 2008.  (Tr. at 285).  Plaintiff appeared personally and was represented by an attorney.  *Id.*

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was 43 years old, had obtained an eleventh grade education, and had been certified as a nurse's aide.  (Tr. at 27-29).  She testified that she was living with her two sons, aged ten and twenty-one, and three minor grandchildren.  (Tr. at 301, 307, 320-21).  She took in her grandchildren to avoid possible custody by the state – her daughter was on drugs, her son had recently been released from prison, and her daughter-in-law had allowed her grandchild to eat

cocaine.  (Tr. at 306-07).  She testified that her children were suffering from mental health issues.  (Tr. at 397-09).

Concerning her physical impairments, Plaintiff stated that she had thyroid problems and blood pressure which left her short of breath on a regular basis.  (Tr. at 293-94).  She suffered from Grave's disease, which caused blurred vision, weight loss, and memory problems; she wore glasses and had lost thirty to forty pounds since 2006.  (Tr. at 295, 311).  She experienced daily headaches that lasted an hour at a time and required her to retreat into a dark space, and they had led to five or six trips to the emergency room since 2006.  (Tr. at 302, 315).  She could stand for no more than thirty minutes at a time and was unable to walk a block.  (Tr. at 294-95).

Regarding her mental impairments, Plaintiff testified that she suffered from a bipolar disorder that caused her to experience mood swings on a daily basis.  (Tr. at 296).  She experienced racing thoughts, crying spells, and nightmares, and she heard voices that told her to harm others.  (Tr. at 296-97, 299).  She described one incident where the voices told her to push her daughter out of a moving car.  (Tr. at 319).  She also suffered from PTSD that caused her depression and nightmares.  (Tr. at 300).  She mostly kept to herself and was distrustful of others.  (Tr. at 296, 300-01).  Plaintiff testified that she experienced thoughts of suicide and had attempted it in the past.  (Tr. at 320).  Plaintiff identified a family history of drug abuse, sexual molestation by her uncle, and issues with her children as the root cause of her psychological problems.  (Tr. at 305-06).

As to her daily activities, Plaintiff stated that she went to sleep at nine or ten o' clock at night and woke up around two or three in the morning; she had difficulty sleeping despite medication.  (Tr. at 297).  She cooked and cleaned some but had trouble doing the laundry.  (Tr. at 301).  Her daughter helped her a lot with the cooking and cleaning.  *Id.*  Plaintiff testified that she drove little and left the house only when needed.  (Tr. at 301-02).  She had problems getting along with people

but she went to church once or twice a month.  (Tr. at 296-97).

### b. *Vocational Expert's Testimony*

A vocational expert ("VE") also testified at the hearing.  The VE testified that Plaintiff's past relevant work included her job as a nurse's aide (medium, semi-skilled, SVP 4).  (Tr. at 327).

The ALJ asked the VE to assume a hypothetical person between ages 38 and 43 who had an 11th grade education and a CNA certificate; was capable of performing a full range of sedentary work that was simple, repetitive and routine and with an SVP no higher than 2; needed a stress-free environment and a sit-stand option at work; had limited contact with the consuming public and co-workers; was only capable of performing work on a level surface with no foot controls; and had to avoid unprotected heights and moving machinery.  (Tr. at 327-28).  The ALJ then asked the VE to opine whether such a person would be able to perform any work in the economy.  (Tr. at 328).  The VE testified that the hypothetical individual would not be able to perform Plaintiff's past relevant work as nurse aide but could perform other jobs in the economy such as the jobs of a surveillance systems monitor, document preparer, and bonder/semi-conductor.  (Tr. at 328-29).

Upon cross examination by Plaintiff's attorney, the VE testified that such an individual would not be able to maintain any job if she could not maintain her pace or concentration for a third of an eight-hour workday, or if she needed 5-minute breaks every hour.  (Tr. at 330-31).

### C.     ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on March 26, 2009.  (Tr. at 13-22).  He found that Plaintiff had met the insured status requirements through June 30, 2005 for purposes of entitlement to Title II benefits, but based on her alleged disability onset date of April 2, 2006, had not met the special earnings requirements for such benefits.  (Tr. at 20, ¶1).  The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged

disability onset and had the following severe impairments: a bipolar disorder; history of generalized anxiety; PTSD; hypothyroidism, status post thyroidectomy secondary to thyroid tumor; history of anemia; and essential hypertension.  (Tr. at 20-21. ¶¶2, 3).  He concluded, however, that these impairments did not meet or equal a listed impairment.  (Tr. at 21, ¶3).

The ALJ classified Plaintiff as a younger individual and limited her RFC to simple, routine and repetitive sedentary work performed in a relatively stress-free environment with only limited contact with the general public and co-workers, a sit/stand option at will, a limitation to work only on level services with no operation of foot controls, and a limitation not to work at unprotected heights or around moving machinery.  (Tr. at 21, ¶¶5, 8).  The ALJ found that Plaintiff, with her RFC, could not perform her past relevant work as a certified nurse aide but could perform other jobs that existed in significant numbers in the regional and national economies.  (Tr. at 21, ¶¶ 6,10).  Based on these findings, the ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, at any time through June 30, 2005, her last date insured.  (Tr. at 21, ¶11)

## II.  ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.      Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

> 1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to
        be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of
        the regulations will be considered disabled without consideration of
        vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a
        finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work,
        other factors including age, education, past work experience, and residual
        functional capacity must be considered to determine if work can be
        performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies

his or her burden under the first four steps, the burden shifts to the Commissioner at step five to

show that there is other gainful employment available in the national economy that the claimant is

capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference

to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issues for Review**

Plaintiff identifies the following issues for review:

(1)     The ALJ's decision is not supported by the substantial evidence of record;

- 11 -

> (2)    The ALJ erred by failing to find borderline intellectual functioning a severe impairment.

(Pl. Br. at 11, 15).

## C.    <u>Issue One: Substantial Evidence</u>

Although Plaintiff generally attacks the ALJ's decision as unsupported by substantial evidence, she specifically complains that the ALJ erred by failing to give controlling weight to Dr. Zaman's RFC opinion concerning her physical and mental limitations as well as his opinion that Plaintiff was totally and permanently disabled.  (Br. at 11-14).  She contends that even if the opinions were not entitled to controlling weight, the ALJ was required to consider them using the six factors listed in 20 C.F.R. § 404.1527.  (Br. at 14).

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. § 404.1527(c)(2).  Every medical opinion is evaluated regardless of its source but the Commissioner generally gives greater weight to opinions from a treating physician.  20 C.F.R. § 404.1527(d).  In fact, when "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  *Id.*  If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion:  (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  *See id.* § 404.1527(d)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  If evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.*  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455-56.  Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458.

Here, Plaintiff contends that two of Dr. Zaman's opinions were entitled to either controlling weight or a six-factor analysis by the ALJ.  The first opinion stated that Plaintiff was "totally and permanently disabled."  The ALJ was not required to give controlling weight or to conduct a six-factor analysis of that opinion, however, because a determination of disability is not a medical opinion; it is a legal conclusion reserved to the Commissioner. 20 C.F.R. § 404.1527(e); SSR 96-5p, 1996 WL 374183 (S.S.A. 1996); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

The second opinion, which can be found in a post-hearing RFC questionnaire, concerned

Plaintiff's physical and mental limitations.  The opinion stated that Plaintiff was severely limited in her ability to walk, sit and stand, would need five to six unscheduled 25-minute breaks in an 8-hour workday, and would likely miss more than four days of work per month.  It also stated that Plaintiff would be unable to complete a normal work day without interruptions from psychologically based symptoms or perform at a consistent pace without unreasonable rest periods, and that she had marked restrictions in activities of daily living; moderate limitations in maintaining social functioning; marked deficiencies of concentration, persistence and pace; and repeated episodes of deterioration or decompensation in work-like settings.

The ALJ noted that Dr. Zaman's RFC opinion assessed some very significant limitations with respect to Plaintiff's daily living activities, concentration, persistence and pace, and that his limitations concerning Plaintiff's days off from work would preclude all types of gainful work.  (Tr. at 19).  The ALJ, however, proceeded to give "little weight" to the opinion, stating that it  was "wholly unsupported by any physical, neurological, psychological examination and diagnostic findings of record."  *Id.*  The ALJ rejected Dr. Zaman's opinion in the presence of two consultative reports by Dr. Weiser and Dr. Israel concerning Plaintiff's psychological assessments.  At no point in his disability determination did he find that one doctor's opinion was more well-founded than another or weigh Dr. Zaman's opinion against another medical opinion.  Instead, the ALJ explained his decision to give little weight to Dr. Zaman's opinion with the simple statement that it was "wholly unsupported."  *Id.*

Because the ALJ did not find that Dr. Zaman's opinion was contrary to that of another treating or examining physician, *Newton* is controlling, and the ALJ was required to consider each of the factors contained in 20 C.F.R. § 404.1527(d)(2) before giving Dr. Zaman's opinion no weight.

Because nothing in the record suggests that the ALJ conducted the required analysis, the ALJ's rejection of Dr. Zaman's opinion was in error.  Due to this error, the Court is unable to determine if substantial evidence supports the ALJ's determination concerning Plaintiff's disability. Accordingly, this case must be remanded to allow the ALJ to conduct the proper analysis or afford Dr. Zaman's opinion its proper weight.  *See Locke v. Massanari*, 285 F. Supp.2d 784, 404 (S.D. Tex. 2001) (holding that an ALJ's failure to consider the criteria of 20 C.F.R. § 1527(d)(2) required remand).

## III.   RECOMMENDATION

*Plaintiff's Motion for Summary Judgment* should be **GRANTED**, *Defendant's Motion for Summary Judgment* should be **DENIED**, and the decision of the Commissioner should be **REVERSED** and the case **REMANDED** for reconsideration.

**SO RECOMMENDED**, on this 11th day of December, 2009.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE